```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                :
UNITED STATES OF AMERICA                        :
                                                :
                                                :       15 Cr. 275 (JSR)
              - v. -                            :
                                                :
                                                :
ELEHECER BALAGUER,                              :
                                                :
                            Defendant.          :
                                                :
------------------------------------------------------------------------X
```

# THE GOVERNMENT'S SENTENCING SUBMISSION

PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Ian McGinley
Assistant United States Attorney
- Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------X
UNITED STATES OF AMERICA

- v. -

ELEHECER BALAGUER,

                      Defendant.

------------------------------------------------------------------------------X

15 Cr. 275 (JSR)

## THE GOVERNMENT'S SENTENCING SUBMISSION

The Government respectfully submits this memorandum in connection with the sentencing of Elehecer Balaguer ("Balaguer" or the "defendant"), which is currently scheduled for October 14, 2015, at 4:00 p.m. On May 5, 2015, the defendant pled guilty, pursuant to a plea agreement, to one count of aiming a laser pointer at an aircraft, in violation of Title 18, United States Code, Section 39A. As stipulated in the plea agreement and agreed to by the Probation Office in its Presentence Report ("PSR"), the correct advisory sentencing range under the United States Sentencing Guidelines (the "Sentencing Guidelines" or "U.S.S.G") is 24 to 30 months' imprisonment.

In March 2015, the defendant shined a laser beam at three passenger airplanes arriving and departing from LaGuardia Airport, one of the busiest airports in the world. The defendant temporarily blinded the pilots of these flights, injuring the pilots and putting the lives of hundreds of passengers at risk. Given the extreme danger caused by the defendant's conduct and the great need to deter others from committing similar offenses, this Court should sentence the defendant within the Guidelines range of 24 to 30 months' imprisonment, as recommended by the Probation Office.

## BACKGROUND

A.   **The Offense Conduct**

   1.   **Background on LaGuardia Airport**

LaGuardia Airport ("LaGuardia") is an airport located in Queens, New York. PSR ¶ 5. LaGuardia is one of the busiest airports in the United States - in 2014, close to 27 million passengers used the airport. *Id*. LaGuardia has two runways, which are numbered in each direction, for arriving and departing planes. *Id*. The two main runway directions are runways 22 and 31. *Id*.

   2.   **The Defendant's Conduct on March 9, 2015**

On March 9, 2015, a pilot ("Pilot-1") operated a commercial flight that landed at LaGuardia ("Flight-1"). PSR ¶ 6. Flight-1 approached runway 22 at LaGuardia at approximately 8:05 p.m., on March 9, 2015. *Id*. As Flight-1 approached LaGuardia, at an altitude of approximately 4,000 feet, a bright green beam of light shined into the cockpit of the plane twice. *Id*. Pilot-1 saw the bright beam of light appear to track the flight pattern of the plane. *Id*. The bright green beam of light struck Pilot-1 directly in the eyes, causing Pilot-1 to temporarily lose focus on his flight controls. *Id*.

On March 9, 2015, another pilot ("Pilot-2") assisted in the operation of a commercial airplane that landed at LaGuardia ("Flight-2"). PSR ¶ 7. Flight-2 approached runway 22 at LaGuardia at approximately 8:06 p.m., on March 9, 2015. *Id*. As Flight-2 approached LaGuardia, at an altitude of about 1,200 feet, a bright green beam of light shined into the cockpit of the plane for approximately two seconds. *Id*. The bright green beam of light struck Pilot-2 directly in the eyes, causing Pilot-2 to temporarily lose sight, and leaving Pilot-2 with pain in his right eye and a headache. *Id*.

On March 9, 2015, another pilot ("Pilot-3") assisted in the operation of a commercial flight that landed at LaGuardia ("Flight-3"). PSR ¶ 8. Flight-3 departed LaGuardia airport at approximately 8:52 p.m., on March 9, 2015, from runway 31. *Id*. When Flight-3 reached an estimated altitude of approximately 1,500 feet, a bright green beam of light shined into the cockpit for about three to five seconds. *Id*. The bright green beam struck Pilot-3 directly in the eyes, causing Pilot-3 to lose sight for approximately five seconds. *Id*. Pilot-3 has provided a victim impact statement for sentencing, which is attached hereto as part of Exhibit A.

Air traffic control at LaGuardia received complaints from the above mentioned pilots about a laser beam shining into the cockpits of their planes when departing and arriving at LaGuardia. PSR ¶ 9. In the response to these complaints, LaGuardia changed the runway directions for all planes arriving at and departing LaGuardia the night of March 9, 2015, in an effort to have the aircraft avoid the laser beam originating from the Bronx, New York. *Id*.

The New York City Police Department ("NYPD") was also notified on March 9, 2015, that multiple pilots reported laser beams being shined at their aircraft at LaGuardia. PSR ¶ 10. In response, two NYPD officers ("Officer-1" and "Officer-2") flew an NYPD helicopter (the "Helicopter") in the vicinity of LaGuardia where these laser incidents occurred. *Id*. At approximately 9:20 p.m., the Helicopter was also struck by a bright green beam of light. *Id*. The laser appeared to originate from a certain second floor apartment in a building in the Bronx, New York (the "Apartment"), which turned out to be the defendant's apartment. *Id*. The laser beam of light struck Officer-1 several times in both eyes, causing Officer-1 to lose sight for approximately three to five seconds. *Id*. The laser beam also struck Officer-2 in both eyes, causing Officer-2 to temporarily lose sight. *Id*. Both Officer-1 and Officer-2 also have provided victim impact letters for sentencing, which are attached as parts of Exhibit A.

At around 9:37 p.m., on March 9, 2015, NYPD officers arrived at the Apartment.  PSR ¶ 11.  NYPD officers knocked on the door of the Apartment.  *Id*.  A woman, who claimed to be the owner of the apartment answered the door and permitted the NYPD officers to enter the Apartment.  *Id*.  At least three people appeared to live in the Apartment, but a certain man ("lndividual-1") appeared to be the only person that had not been sleeping.  *Id*.  Inside the Apartment, law enforcement officers recovered a laser pointer (the "Laser Pointer") from on top of a refrigerator near the window where the bright green laser beam appeared to originate from.  *Id*.  The Laser Pointer emitted a bright green light beam.  *Id*.  On the Laser Pointer itself, the following warning was written in all capital letters, "DANGER- LASER RADIATION- AVOID DIRECT EYE EXPOSURE."  *Id*.

After being advised of his *Miranda* rights and waiving those rights, Individual-1 told law enforcement that the defendant owned the Laser Pointer, and that the defendant bought the Laser Pointer in Florida in January 2015.  *Id*.  Individual-1 denied ever using the Laser Pointer.  *Id*.

The defendant was also interviewed by law enforcement on March 9, 2015.  *Id*.  The defendant told law enforcement that he owned the Laser Pointer, which he purchased in Orlando, Florida, for $50.  *Id*.  The defendant further stated that he only used the Laser Pointer indoors and never pointed the Laser Pointer outside.  *Id*.  The defendant added that he was sleeping at the time law enforcement arrived at the Apartment, and that the defendant did not know who pointed the Laser Pointer out the window of the Apartment at the passing airplanes.  *Id*.

Individual-1 was arrested by the NYPD that night and scheduled to appear in Bronx County Criminal Court on March 13, 2015.  *Id*.

4

### 3. The Defendant's Conduct after March 9, 2015

On March 13, 2015, Individual-1 arrived in Bronx Criminal Court. PSR ¶ 12. During Individual-1's court appearance, the defendant arrived and said that the Laser Pointer belonged to him, and the defendant admitted to pointing the Laser Pointer at an airplane on March 9, 2015. *Id*.

Later that day, the defendant agreed to be interviewed by law enforcement officers in the presence of his attorney. PSR ¶ 13. During the interview, the defendant stated the following: (1) the defendant lived in the Apartment with three other people, including Individual-1; (2) the defendant bought the Laser Pointer, which emits green light, in Florida; (3) on March 9, 2015, the defendant was playing with the Laser Pointer, saw a plane, and pointed the Laser Pointer at the plane; (4) the defendant subsequently heard a helicopter near the Apartment; (5) after using the Laser Pointer during the evening of March 9, 2015, the defendant placed the Laser Pointer on a refrigerator in the Apartment; (6) the defendant lied to law enforcement when he was interviewed on March 9, 2015; and (7) Individual-1 did not use the Laser Pointer. *Id*.

### B. The Defendant's Arrest and Guilty Plea

On March 16, 2015, the defendant surrendered to law enforcement authorities and was arrested and charged by complaint with count of aiming a laser beam at an airplane.

On May 5, 2015, the defendant waived indictment and pled guilty, pursuant to a plea agreement, to Information 15 Cr. 275, charging him with one count of aiming a laser beam at an airplane.

### C. The Defendant's Criminal History

As noted in the plea agreement and PSR, the defendant has an extensive criminal history. This crime represents the defendant's 16th criminal conviction. PSR ¶¶ 30-61. Many of these convictions involved the defendant selling and possessing narcotics, though the defendant has

also previously been convicted of a violent crime. PSR ¶ 46. Specifically, on or about July 5, 2000, in New York State Supreme Court, Queens County, the defendant was convicted of assault in the second degree for striking the victim with a metal pipe, fracturing the victim's leg and causing lacerations to the victim's left eye and blunt trauma to the victim's head. PSR ¶¶ 47-48. The injuries the victim sustained were so severe that hospital officials believed the victim would be disabled for life. PSR ¶ 48.

**D.    The Presentence Investigative Report**

On July 27, 2015, the Probation Office issued its PSR in connection with the defendant's sentencing. The PSR calculated an offense level of 15 and a Criminal History Category of III. PSR ¶ 97. The Probation Office's Guidelines calculation is not in dispute, and mirrors that contained in the plea agreement.[1] Based on an offense level of 15, and a Criminal History Category of III, the Probation Office determined a Guidelines range of 24 to 30 months' imprisonment. *Id*.

The Probation Office recommends a sentence of 24 months' imprisonment. PSR pp. 20-21. In support of this recommendation, the Probation Office emphasized the seriousness of the defendant's conduct: "[a]iming a laser pointer at a flying aircraft is inexcusable, as it endangers not only the passengers and crew of the airplane, but also those on the ground." PSR at p. 21.

## DISCUSSION

**A.    Applicable Law**

The United States Sentencing Guidelines still provide strong guidance to the Court following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d

---

[1] The plea agreement contains a typographical error, stating that the defendant's Criminal History Category is II, when, in fact, he is in Criminal History Category III. However, the Guidelines range in the plea agreement is correct, and it is undisputed that the defendant is properly in Criminal History Category III.

103 (2d Cir. 2005). Although *Booker* held that the Guidelines are no longer mandatory, it also held that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" — that "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); (2) the four legitimate purposes of sentencing, as set forth below, *see id.* § 3553(a)(2); (3) "the kinds of sentences available," *id.* § 3553(a)(3); (4) the Guidelines range itself, *see id.* § 3553(a)(4); (5) any relevant policy statement by the Sentencing Commission, *see id.* § 3553(a)(5); (6) "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and (7) "the need to provide restitution to any victims," *id.* § 3553(a)(7). *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

>   (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
>   (B)   to afford adequate deterrence to criminal conduct;
>
>   (C)   to protect the public from further crimes of the defendant; and
>
>   (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### B.  A Guidelines Sentence is Appropriate

As discussed below, the application of the factors under Section 3553(a) warrants a sentence within the Guidelines range of 24 to 30 months.

1.  <u>Seriousness of the Offense</u>

This was an extremely dangerous crime, risking the lives of hundreds of innocent people and numerous law enforcement officers and disrupting air traffic at one of the busiest airports in the world.  The defendant shined a laser beam at two airplanes landing at LaGuardia and one airplane departing LaGuardia.  These planes were commercial passenger jets carrying hundreds of people.  The defendant also caused tangible harm.  The laser beam pointed by the defendant struck the pilots of these airplanes in the eyes, causing the pilots to temporarily lose focus and jeopardizing the safety of all of those on board the plane, as well as those on the ground in the vicinity of these planes.  In a victim impact statement submitted to the Court by one of the pilots, First Officer Daniel Louis Kleiman (referred to as "Pilot-3" in the Complaint and above) writes, "I was hit on 4 or 5 times over a 3 to 4 second interval by something very bright on the side of my right eye.  For these couple of seconds, while this was shining in my eye, I was blinded and could not see and monitor the flight instruments." Exhibit A (victim impact letters).

The defendant's terrorizing behavior did not end with shining his beam at the commercial aircraft.  When the NYPD responded to the scene, the defendant shined his laser at the two officers (*i.e.*, Officer-1 and Officer-2) operating an NYPD helicopter attempting to find the defendant, endangering the lives of these law enforcement officers, who were also temporarily blinded.  Both of these pilots have submitted victim impact letters, describing impact the laser beam had on their vision and their fright at being temporarily blinded while flying a helicopter. *See* Exhibit A.  Tactical Flight Officer Royston Charles writes that after being struck by the laser beam in his left eye for about 3 to 5 seconds, "I was blinded for a fraction of a second and had

8

blurred vision a few seconds after. I experienced a tingling sensation in my eye which lasted for a few minutes, this made it very difficult to do my job." *Id*. And when the defendant was confronted by law enforcement on March 9, 2015, he lied. He falsely told police that he had never pointed the laser outside and was sleeping at the time of the offense.

It cannot be said that the defendant did not understand the consequences of his actions in shining the high powered laser beam at these airplanes. The bold print on the laser he utilized notes that the laser is dangerous and should not be directed at someone's eyes. Nevertheless, out of some perverted sense of amusement, the defendant callously disregarded this warning.

Thankfully, the defendant's conduct did not result in the loss of life. However, his crime caused injuries to the pilots of the planes and the helicopter, who sought medical attention. As noted in the victim impact letter submitted by First Officer Kleiman (i.e. Pilot-1), after being hit in the eye by the laser, he was precluded from flying until he was examined by an ophthalmologist. *See* Exhibit A. Luckily, there was no permanent damage to his eye, but his suffered intense stress as a result of the incident, and thought he had reached "the potential end of [his] flying career." *Id*. The defendant's conduct also disrupted the operations of an entire airport, causing air traffic control at LaGuardia to change the runway direction of all incoming and outgoing flights.

A significant sentence is therefore necessary to reflect the seriousness of the crime, promote respect for the law, and provide a just punishment for an offense that placed hundreds of lives at risk and caused tangible harm to the airline pilots and law enforcement officers.

2.    <u>The Need for the Sentence to Serve as a General and Specific Deterrent</u>

A significant sentence is also needed to deter others from engaging in similar offenses. Laser incidents (meaning someone shining a laser beam at an airplane near an airport) are a large

problem at New York City airports. The number of laser incidents in the United States is rapidly increasing. In 2006, there were 384 laser incidents reported to the Federal Aviation Administration ("FAA"); in 2014, that number swelled to 3,894.[2] The number of reported laser illumination incidents is particularly alarming, since "the misuse of laser devices poses a serious threat to aviation safety."[3] Aviators, such as helicopter pilots, are particularly vulnerable to laser illuminations when conducting low-level flight operations at night.[4] According to FBI statistics, in 2014, there were 71 reported laser incidents, resulting in injuries to 11 pilots. So far, in 2015, there have been 78 laser incidents, resulting in injuries to 8 pilots.

Despite these alarming numbers, this case represents the first felony disposition under Title 18, United States Code, Section 39A, in the New York City area. That is because pinpointing and locating the user of a laser pointer in the New York City area is like finding a needle in the haystack, and requires significant law enforcement resources. In this case, the NYPD deployed a helicopter to the vicinity of LaGuardia to help locate the source of the laser beam. Even after the NYPD identified that the laser beam originated from the defendant's apartment (which was occupied by multiple people), law enforcement still could not identify the exact person who operated the laser beam. Indeed, were it not for the defendant's confession in this case, a prosecution may not have been viable. A substantial sentence is therefore necessary here to demonstrate to others that the commission of this type of serious crime will result in significant penalties, and to counterbalance the lower risk of apprehension.

With respect to specific deterrence, it is clear that the defendant is a recidivist. He has committed numerous felonies, including drug dealing crimes and a violent assault. He has been

---

[2] *See* http://www.faa.gov/about/initiatives/lasers/

[3] *See* http://www.faa.gov/pilots/safety/pilotsafetybrochures/media/laser_hazards_web.pdf

[4] *Id.*

10

in and out of prison for over a decade. The instant offense proves that the defendant is capable of adapting his crimes to the times, utilizing relatively recent technology to hurt others in ways that he could not before. A significant sentence is therefore needed to deter the defendant with a lengthy criminal history from engaging in future crimes.

## **CONCLUSION**

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence within the applicable Guidelines range of 24 to 30 months' imprisonment.

Dated: New York, New York
October 5, 2015

Respectfully submitted,

PREET BHARARA
United States Attorney

By:   _____/s/_____
Ian McGinley
Assistant United States Attorney
Tel.: (212) 637-2257

# EXHIBIT A



**AIR CANADA**
Flight Operations
YYZ 2224, Lester B. Pearson International Airport
P.O. Box 6002, Station Toronto AMF
Mississauga, ON L5P 1B4

August 5, 2015

The Honorable Jed S. Rakoff
United States District Judge
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

**SUBJECT:    Impact of laser pointing at flight AC**

Honorable Justice Rakoff,

I make this statement as I understand you will be called upon to impose a penalty on the person that is responsible for pointing a laser at flights in the New York area.

My name is Daniel Louis Kleiman and I am a First Officer with Air Canada, operating Embraer 190 jets since 2012 and have held a Canadian commercial pilot license for 10 years. I wanted to be a pilot since I was a child.

On March 9, 2015, I was occupying the first officer position on Air Canada flight AC727 which was departing La Guardia, Airport in New York at 20:35 EST destined for Toronto, Ontario, Canada.

The Captain was the "pilot flying" meaning he was the one piloting the aircraft, while I was assigned the monitoring numerous flying instruments on onboard the aircraft and communications with Air Traffic Control during this critical phase of flight.

Indeed, upon take-off and landing, the operations are very task-intensive.

As we were at approximately 3000 feet of altitude and climbing our heading of 359 as assigned by Air Traffic Control, I was hit on 4 or 5 times over a 3 to 4 second interval by something very bright on the side in my right eye. For these couple of seconds, while this was shining in my eye, I was blinded and could not able to see and monitor the flight instruments.

.../2

Page 2

This was one of the worst times for a distraction like this as our full and undivided attention is required for the safe operation of this flight.

Luckily, I was not the pilot flying. Had I been the pilot flying, this would have jeopardized the lives of the passengers and crew on the aircraft and any persons on the ground.

We reported this immediately to Air Traffic Control and advised them of our exact position when this happened and that this came from East of our flight path at the current position of Lat/Long N40 50.4 W073 54.2. We were requested to call New York Traffic Control. Upon Landing and calling the Traffic Control, Manager Jeff Brooks requested we call NYPD Aviation Unit's Lt Gomez. The Captain and I did call Lt. Gomez upon landing and gave brief statement of the facts.

Because of the strict mandated high visual acuity standards we are required to have to be granted the permission to fly a commercial aircraft, I was precluded from operating an aircraft until I had my eyes examined by a professional (an ophthalmologist) to ensure that I still met these standards.

I was able to secure an appointment the next day, and luckily there no immediate damage to my eye was found.

Until I had the results of this medical examination, I was very stressed as I was seeing the potential end of my flying career.

I remain available should you require to speak to me.

Yours sincerely,

*[signature]*

**First Officer Daniel Louis Kleiman**

The Honorable Jed S Rakoff
United States District Judge
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

Honorable Justice Rakoff,

My name is Richard Mardarello I am a Detective with the New York City Police Department Aviation Unit. I started flying airplanes in 1986 and now fly helicopters for the NYPD Aviation Unit. I am a flight instructor in airplanes and helicopters and also a flight instructor in the NYPD Aviation Unit.

On March 9, 2015 at approximately 9:20 PM while conducting routine patrol duties with tactical flight officer Royston Charles in a NYPD Bell 429 helicopter. I was at the pilot in command seat and Officer Charles was in the tactical flight officer seat. We were directed via police radio to an area of the Bronx where a laser was being directed at aircraft arriving and departing LaGuardia airport. When LaGuardia switched runways we decided that we would fly the approach to runway 22 at approximately the same altitude and flight path as the airlines. We then flew the approach and about four miles from the end of the runway I observed flashes outside the right rear of the helicopter. I turned the helicopter to the right and saw a green laser emitting from the ground just northeast of our position. It was then that I was hit directly in my eyes causing temporary visual impairment. It would be for a few seconds that the laser hit my eyes. This continued several times over until we descended to 300-400 feet above the ground and across the street from the source of the laser. Officer Charles then called the local precinct and guided them to the building and window where the laser was emitted. The individual was then apprehended.

After the apprehension I flew back to our base at Floyd Bennett Field in Brooklyn. We then were taken directly to New York Eye and Ear Infirmary Of Mount Sinai for immediate examination.

I would like to stress how dangerous this situation was and the outcome could have been disastrous had the airline pilots lost control of their aircraft due to visual impairment.

Respectfully,

NYPD Detective Richard Mardarello

Septemper 2, 2015

The Honorable Jed S. Rakoff
United States District Judge
Daniel Patrick Moynihan U.S Courthouse
500 Perl Street
New York, New York 10007

Subject: Impact of laser pointing.

Honorable Justice Rakoff,

My name is Royston Charles and I am a Tactical Flight Officer with the NYPD Aviation Unit, operating a Bell 429 Helicopter. I obtained my commercial pilot's license 9 months ago. My primary responsibilities include operating the camera, search light and monitoring the flight instruments to ensure safe flight.

On March 9, 2015 at approximately 2120 EST, while conducting routine patrol in the New York City area with Detective Richard Mardarello (Pilot in Command), we were called by our base to investigate a green laser being pointed at airplanes departing and landing LaGuardia airport. We responded to the location without delay.

We arrived at the location approximately 10 minutes after receiving the call. Detective Mardarello received directions for LaGuardia air traffic controllers, regarding the location where they suspect the laser might be coming from. I was operating the camera and simultaneously looking outside to locate the exact location where the laser was coming from.

While searching the area for approximately 10-20 minutes our cockpit was illuminated by a bright green light, which flashed in my left eye 3-4 times for approximately 3-5 seconds. I was blinded for a fraction of a second and had blurred vision a few seconds after. I experienced a tingling sensation in my eye which lasted for a few minutes, this made it very difficult for me to do my job. We were able to locate where the light was coming from. We identified the house where the light was coming from and coordinated ground units to the exact location. (2801 CODDINGTON AVE), where they conducted an investigation and recovered a green laser. Upon completion of the job we returned to our base located at Floyd Bennett Field in Brooklyn.

Still feeling the effects of the laser after landing, we were taken to New York Eye and Ear Infirmary of Mount Sinai for an eye evaluation, which revealed no damage to my eyes. It was stressful knowing how worst the outcome could have been.

Respectfully

NYPD Police Officer Royston Charles